STATE OF NORTH CAROLINA v. GEORGIA WIGGINS, DONALD MARTIN COOPER, LEWIS CHERRY, ERVIN CHERRY, GOLDEN FRINKS, JAMES SPELLER, J. ALFRED CHERRY, CLIFTON JORDAN, DAVID BOND, HARVEY RANDOLPH SPELLER, JR., GEORGE L. ROUNTREE, TIM HAYES JORDAN, NATHANIEL LEE, JR.

(Filed 13 December, 1967)

**1. Statutes § 5—**

   In the construction of a statute words are to be given their plain and ordinary meaning unless the context, or the history of the statute, requires otherwise.

**2. Schools § 15;   Criminal Law § 1—**

   The statute, G.S. 14-273, making it unlawful wilfully to interrupt or disturb any school, is not void for vagueness in failing to define "interrupt" or "disturb", since the words, when read in conjunction with "school", convey to a person of ordinary intelligence the meaning of a substantial interference with, and the disruption of, the operation of a school in the instruction of pupils enrolled therein.

**3. Schools § 15—**

   The elements of the offense punishable by G.S. 14-273 embrace some act or conduct by the defendant within or without the school, resulting in an

actual and material interference with part or all the program of the school; and with the intent by the defendant that his act or conduct have such result.

**4. Criminal Law § 2—**

A person who has reached the age of responsibility for his acts and who is not shown to be under mental disability is presumed to intend the natural consequences of his acts and conduct, and, nothing else appearing, the defendant's motive for wilfully doing an act forbidden by statute is no defense to the charge of violating such statute.

**5. Schools § 15—**

Warrants charging a violation of G.S. 14-273 held sufficiently specific in this case to protect the defendants from double jeopardy.

**6. Same—**

Evidence for the State tending to show that the defendants paraded back and forth in the front of a rural public school while classes were in progress therein, that the defendants carried signs with messages relating to some controversy with the school administration, that students left their classes to observe the picketing, and that a class held on the school grounds was terminated during the course of defendants' activities, held sufficient to be submitted to the jury on the issue of defendants' guilt in wilfully interrupting and disturbing a school.

**7. Same; Criminal Law § 9—**

Evidence of the State that the defendant transported other defendants to a public school where classes were in progress, that he passed out to the defendants signs bearing messages relating to a school controversy, that he directed the defendants in line for marching, and that classes were disrupted during the course of defendant's activities, held sufficient to go to the jury on the issue of defendant's guilt of aiding and abetting the other defendants in interfering with the classes of a public school.

**8. Schools § 15—**

In a prosecution for wilfully disturbing the classes of a public school, testimony that students left their classes and observed the picketing of the school by the defendants is clearly competent and properly admissible in evidence, since an essential element of the offense is the actual interruption and disturbance of the program of the school.

**9. Jury § 2—**

Upon a finding that a disproportionately small number of Negroes had been included in the jury box from which the jury panel had been drawn, an order by the trial court dismissing the regular panel and directing the sheriff to summon a special venire of fifty persons without regard to race, held expressly authorized by G.S. 9-11, it not being a requisite to the calling of the tales jurors under the statute that their use be restricted to supplement an insufficient number of regular jurors.

**10. Same—**

A special venire is not rendered invalid by reason that the sheriff who summoned it was subsequently a witness for the State in the case.

**11. Schools §§ 1, 15; Constitutional Law § 18—**

Freedom of speech and protest against the administration of public affairs is a fundamental right long cherished in this State, but it is not

an absolute freedom, and the State, in the protection of the freedom of others and of its own paramount interests, such as the education of its children, may impose reasonable restraints of time and place upon the exercise of both speech and movement.

**12. Same—**

Neither the enactment of G.S. 14-273, proscribing the wilful disruption of a public or private school, nor its enforcement against certain defendants who picketed a public school to the detriment of the instruction of students therein, constitutes censorship of speech or protest in violation of the First Amendment, U. S. Constitution, since the State may unquestionably control the hours and place of public discussion in the protection of its legitimate interest in the efficient operation of the schools.

**13. Constitutional Law § 20;    Schools § 15—**

G.S. 14-273 is not discriminatory upon its face, since its penalty applies uniformly to all who violate its terms, and, since the statute does not confer upon any administrative official the discretionary authority to issue permits for demonstrations interrupting school programs, the question of discrimination does not arise. N. C. Constitution, Art. I, § 17; U. S. Constitution, Amendment XIV.

**14. Schools § 15—**

In a prosecution under G.S. 14-273, it is irrelevant that the defendants' motive in picketing a school was to improve the education process, since their wilful activities resulting in the disruption of classes are forbidden by the statute.

**15. Same—**

In a prosecution for wilfully interrupting a public school, G.S. 14-273, it is irrelevant that the defendants picketed silently, were not on the school grounds, and did not threaten or provoke violence, when their actions plainly sought to attract and to hold the attention of the students at a time when the school was engaged in instruction.

APPEAL by defendants from *Fountain, J.,* at the 6 February 1967 Session of BERTIE.

The defendants were tried on separate warrants, which were consolidated for trial. The warrants, as to all of the defendants except Frinks, charged that on or about 13 September 1966 the defendant named therein "did knowingly, wilfully and unlawfully interrupt and disturb the Southwestern High School, a public school in Bertie County, N. C., by picketing in front of the Southwestern High School," which picketing interfered with classes at the school in violation of G.S. 14-273. The warrant against Frinks charged him with aiding and abetting in such interruption and disturbance of the school.

Prior to pleading to the warrants, the defendants moved to quash each warrant on the ground that it shows upon its face that the defendant named therein was "in the peaceful and orderly exercise of

First Amendment rights of picketing and * * * of freedom of speech and protest," and on the further ground that G.S. 14-273 is unconstitutional, as applied to the alleged conduct of the defendants, "by reason of the obvious collision between the statute and the rights of peacefully picketing." The motion to quash was overruled as to each defendant.

Prior to pleading to the warrants, the defendants challenged the array of jurors summoned for that session of the superior court, the ground of the challenge being that Negroes had been systematically excluded from the jury list, and so from the jury box, from which the panel in question was drawn. All of the defendants are Negroes. The court conducted a hearing upon this motion, at which numerous witnesses, including county officials and others, were called by the defendants and examined. The presiding judge thereupon found as a fact that "there has been a disproportionate number of white persons to that of Negro persons whose names have been put in the jury box for the drawing of jurors" as compared with the proportion of Negro residents of the county to the total population, and as compared with the proportion of Negroes listing property for taxes with the total number of persons so doing, which disproportion he found to have been without any intention to discriminate on account of race in the selection of names to be placed in the jury box. The trial judge then ordered that "to assure each defendant that he and she will be tried by jurors who are selected without regard to race," no juror will be called into the box for the trial of these cases from the regular panel, but the sheriff would summon "fifty persons who are qualified to serve as jurors * * * without regard to race."

The sheriff so summoned a special venire and from it the trial jury was selected, six of its members being Negroes and six being white persons.

Thereupon, prior to entering their pleas to the warrants, the defendants objected to the special venire on the ground that they were entitled to be tried by jurors "selected by the Constitutional system that is provided by the State." The sheriff was called as a witness and examined by the defendants concerning the method used by him in selecting those comprising the special venire. The objection of the defendants to the special venire was overruled.

Thereupon, the defendants entered pleas of not guilty. The jury returned a verdict of guilty as to each defendant. The defendants, other than Frinks, were fined in varying amounts. Frinks was sentenced to confinement in the county jail for a term of 60 days. Each defendant appealed.

The State called as witnesses the principal of Southwestern High

School, the teacher of the class in bricklaying at the school, and the sheriff of the county. The defendants offered no evidence.

The school principal testified that on the date named in the several warrants the school was in session. It is located on Highway 308, some five miles from the Town of Windsor. Only two residences are in the vicinity of the school, the nearest being 100 yards away. The school building sits back from the highway approximately 500 feet. At the time of the alleged offense, the class in brick masonry was in progress, under the direction of its teacher, on the school grounds approximately 10 to 25 feet from the highway, the students in the class being engaged in the erection of certain brick structures as part of their class work. Other pupils were inside the building where classes were in progress. Frinks drove up to a point on the highway in front of the school, "unloaded some children and took out some signs with various wording * * * and gave each one a sign and they began to picket"; i.e., to walk up and down the ditch separating the highway from the school campus. The school principal thereupon asked the sheriff, who was present, "if he could get those people away." Each of the defendants, other than Frinks, participated in the marching. (The principal did not name Lewis Cherry among the marchers, but he was so named by the sheriff.) This conduct by the defendants resulted in the pupils within the school building "looking and carrying on" to such an extent that the principal had "to get them back to their classes and walk up and down the hall * * * trying to keep them in class." When the principal went back into the building, he found pupils in the classes in progress in rooms facing the highway "looking out of the windows at what was going on," and pupils from classes in progress on the other side of the building corridor "running to the side that looked out on the marchers to see what was happening." These students "were talking among themselves * * * saying what they had seen." The brick masonry class, consisting of 15 or 16 students, was taken from its work on the school grounds back to the "shop" before the completion of its fully allotted class period. There was no problem in keeping order in the school except during the time "when these defendants were out in front" of the school.

The teacher of the class in bricklaying testified that he was conducting his class on the school grounds, the project in hand being the construction of some brick columns, some ten feet from the ditch in or along which the defendants, other than Frinks, marched. There were 15 students in the class. The marchers appeared some ten minutes after the class started. They arrived in an automobile, got out of it in front of the school grounds, passed out some signs and then marched along the ditch. The teacher tried to keep his students

busy but the marchers took their attention, and some of the students stopped what they were doing and watched the marchers. The teacher talked to his students but could not maintain control of the class, so he gathered up the tools and took the class back into the building two hours before they were scheduled to complete their assignment on the grounds. The marchers were not singing, clapping their hands, or doing anything except marching.

The sheriff testified that he had been at the school when it opened for the day's work, but after the school opened, he left in his automobile. Approximately four miles away he met Frinks with four or five other people in his car. The sheriff at once returned to the school. Upon his arrival there, he found Frinks' car parked on the shoulder of the highway, with several people standing around it, and Frinks handing out signs "to the students." (Apparently the marchers were students enrolled in the school but not in attendance upon classes that day.) The sheriff asked Frinks if he was aware of the statute of North Carolina forbidding the interruption of a public school. Frinks replied, "I don't care anything about what is in the Statute Books." (The court instructed the jury that the testimony of the sheriff concerning the remarks of Frinks was evidence as to Frinks only and not as to any other defendant.) The defendants, other than Frinks, together with some eight others who were "juveniles," then lined up and started marching. They were arrested after they had marched up and down two or three times. The sheriff observed several students standing and watching the demonstration and the marching. He also observed the teacher of the bricklaying class carry his class back into the "shop." After passing out the signs to the marchers and lining up the marchers, "Frinks got in his car and drove off, headed toward Windsor." Approximately 20 minutes elapsed from the arrival of the defendants at the site of the marching to the arrest of the marchers. Frinks was arrested two days later.

The various signs carried by the marchers read as follows:

"God set us free why should we be here as slaves."

"A change is going to come."

"Freedom, Yeah, Yeah, Yeah."

"We want to talk but you make us talk and we'll talk and you will walk."

"We want to be taught a free education."

"Let us be free and taught free."

"Searching, searching for a free Southwestern."

"Southwestern will overcome some day."

"What about our buttons, Mr. Singleton? Freedom!"

"Freedom in '67."
"We want to grow up free!"

*Attorney General Bruton and Deputy Attorney General Moody for the State.*
*Clayton & Ballance, J. LeVonne Chambers and Mitchell & Murphy for defendant appellants.*

LAKE, J. The pertinent provisions of G.S. 14-273 are:

> "If any person shall wilfully interrupt or disturb any public or private school * * * either within or without the place where such * * * school is held * * * he shall be guilty of a misdemeanor, and shall, upon conviction, be fined or imprisoned or both in the discretion of the court."

The defendants argue in their brief that this statute is void because its prohibitions are uncertain, vague or indefinite, under the rule applied by this Court in *State v. Furio*, 267 N.C. 353, 148 S.E. 2d 275. They argue in their brief that the statute contains no definition of "interrupt" or of "disturb" and, consequently, men of common intelligence must necessarily guess at its meaning and thus be left in doubt as to what conduct is prohibited. It is difficult to believe that the defendants are as mystified as to the meaning of these ordinary English words as to they profess to be in their brief. Clearly, they have grossly underestimated the powers of comprehension possessed by "men of common intelligence." Nevertheless, we treat this contention as having been seriously made.

It is elementary that in the construction of a statute words are to be given their plain and ordinary meaning unless the context, or the history of the statute, requires otherwise. *Cab Co. v. Charlotte*, 234 N.C. 572, 68 S.E. 2d 433; *In re Nissen's Estate*, 345 F. 2d 230. While the meaning of "interrupt" and of "disturb" is perhaps more easily understood than defined with precision, resort to Webster's Dictionary reveals that "interrupt" means "to break the uniformity or continuity of; to break in upon an action," and "disturb" means "to throw into disorder." For those who are unhappy without citation to authorities of the type customarily cited in judicial opinions, we refer to Black's Law Dictionary and to *Watkins v. Manufacturing Co.*, 131 N.C. 536, 42 S.E. 983, where this Court said that an allegation in a complaint for personal injury that the plaintiff had been "disturbed in body" must be understood to mean that "her body was thrown into a state of disorder, and thereby injured."

In *Kovacs v. Cooper*, 336 U.S. 77, 69 S. Ct. 448, 93 L. Ed. 513, the Supreme Court of the United States, speaking through Mr.

Justice Reed, in sustaining a conviction in the courts of the State of New Jersey for violation of an ordinance forbidding the use of sound trucks emitting "loud and raucous" sound, said:

> "The contention that the section is so vague, obscure and indefinite as to be unenforceable merits only a passing reference. This objection centers around the use of the words 'loud and raucous.' While these are abstract words, they have through daily use acquired a content that conveys to any interested person a sufficiently accurate concept of what is forbidden."

When the words "interrupt" and "disturb" are used in conjunction with the word "school," they mean to a person of ordinary intelligence a substantial interference with, disruption of and confusion of the operation of the school in its program of instruction and training of students there enrolled. We found no difficulty in applying. this statute, in accordance with this construction, to the activities of a group of white defendants in *State v. Guthrie*, 265 N.C. 659, 144 S.E. 2d 891. Obviously, the statute applies in the same manner regardless of the race of the defendant. In *State v. Ramsay*, 78 N.C. 448, in affirming a conviction for the similar offense of disturbing public worship, this Court, speaking through Smith, C.J., said:

> "It is not open to dispute whether the acts of the defendant were a disturbance in the sense that subjects him to a criminal prosecution, and that the jury was warranted in so finding, when they had the admitted effect of breaking up the congregation and frustrating altogether the purposes for which it had convened."

Giving the words of G.S. 14-273 their plain and ordinary meaning, it is apparent that the elements of the offense punishable under this statute are: (1) Some act or course of conduct by the defendant, within or without the school; (2) an actual, material interference with, frustration of or confusion in, part or all of the program of a public or private school for the instruction or training of students enrolled therein and in attendance thereon, resulting from such act or conduct; and (3) the purpose or intent on the part of the defendant that his act or conduct have that effect. One, who has reached the age of responsibility for his acts and who is not shown to be under disability of mind, is presumed to intend the natural and normal consequences of his acts and conduct. *State v. Ramsay, supra.* Nothing else appearing, the defendant's motive for doing wilfully an act forbidden by statute is no defense to the charge of violation of such statute. *Cox v. Louisiana,* 379 U.S. 559, 85 S. Ct. 476,

13 L. Ed. 2d 487; *Commonwealth v. Anderson,* 272 Mass. 100, 172 N.E. 114, 69 A.L.R. 1097; 21 Am. Jur. 2d, Criminal Law, § 85.

Each warrant in the present case charges the defendant named therein in plain and precise language with each element of this statutory offense at the specified time and place by the specified conduct of picketing in front of the school, which picketing interfered with classes at the school. Each warrant is sufficiently specific to protect the defendant named therein from being placed again in jeopardy for the same offense. Consequently, the motion to quash the warrants was properly overruled unless the defendants had, as they contend they did have, a lawful right to engage in the specified conduct, notwithstanding the statute.

The uncontradicted evidence of the State, if true, as it must be deemed to be in passing upon a motion for judgment of nonsuit, is sufficient to show that the defendants, other than Frinks, intentionally paraded back and forth in front of the specified public school building and grounds in the immediate vicinity of a class then in progress on the school grounds. The evidence likewise shows that Frinks intentionally aided, abetted, directed and counseled the marching. The marchers carried placards or signs. These signs were utterly meaningless except on the assumption that they related to some controversy between the defendants and the administration of the school, specifically Principal Singleton. Presumably, they were deemed by the defendants sufficient to convey some idea to students or teachers in the school. The site was the edge of a rural road running in front of the school grounds, with only two residences in the vicinity. There is nothing to indicate that the marchers intended or desired to communicate any idea whatsoever to travelers along the highway, or to any person other than students and teachers in the Southwestern High School. As a direct result of their activities, the work of the class in bricklaying was terminated because the teacher could not retain the attention of his students, and disorder was created in the classrooms and hallways of the school building itself. Consequently, the motion for nonsuit was properly overruled unless the defendants had, as they contend, the lawful right so to interrupt and disturb this public school, notwithstanding the provisions of the statute.

The contention of the defendants that the court committed error in admitting evidence as to the conduct of the students in the bricklaying class and in the school building in response to the marching of the defendants must be deemed frivolous. An essential element of the offense charged in the warrants is the actual interruption and disturbance of the program of the school. Obviously, this can be shown only by evidence of the effect of the defendants' conduct upon

the activities of the teachers and students of the school. The witnesses, who testified concerning this, related their own observations of what happened upon the school grounds and within the school building while the conduct of the defendants was in progress, as contrasted with the good order which prevailed prior to the commencement of the marching and after the departure of the defendants. Such evidence was clearly material and competent.

When the defendants challenged the array of regular jurors summoned for the term, on the ground of unconstitutional discrimination against members of their race in the selection of names to go into the jury box from which the panel was drawn, the trial judge conducted a hearing and heard all of their evidence upon that matter. Upon this evidence, he found that a·disproportionately small number of names of Negroes had been included in the box. He thereupon ordered that no member of the regular jury panel be called as a juror for the trial of these cases and directed the sheriff to summon a special venire of fifty persons "without regard to race." This was done and from that panel the jury which tried and convicted the defendants was chosen, six of those jurors being Negroes. The contention of the defendants that it was error to order such special venire is without merit. The procedure so followed by the trial judge is expressly authorized by G.S. 9-11, and the contention of the defendants that tales jurors can be called only to supplement an insufficient number of regular jurors is refuted by the very case they cite in their own brief, *State v. Manship*, 174 N.C. 798, 94 S.E. 2, in which this Court, speaking through Clark, C.J., said:

> "It has never been controverted that the judge in his discretion has the power to excuse any juror and to discharge any jury that he thinks proper. It seems that in this case the regular jury had been discharged under the impression that the business of the court was over. This case coming up, the defendant asked for a continuance. But, there being no other ground suggested therefor, the court, in the exercise of its discretion, directed tales jurors to be summoned, under the above statute [G.S. 9-11], which was passed for this very purpose, that 'there may not be a defect of jurors.' There was long a practice, under the former statute, that the judge should reserve one juror of the regular panel to 'build to,' based upon the technical idea that the tales jurors should be *other* jurors, as if they would not be 'other' jurors even if that one juror had also been discharged. It was no prejudice to this defendant that one regular juror was not retained. Twelve jurors, freeholders, to whom he entered no exception, sat upon his case, and he was duly convicted."

There is nothing in this record to indicate that any juror who sat upon the case and convicted the defendants was challenged by any of the defendants. The record does show that the defendant Wiggins, having exhausted her peremptory challenges, attempted to challenge peremptorily a seventh juror and her challenge to that juror was disallowed. However, the record shows that the juror so challenged by her was removed from the jury upon the peremptory challenge of another defendant.

The record does not indicate that any other case was tried at this term of court or that any regular juror, or any other juror drawn from the jury box, participated in any way whatever in any proceeding before the court at this term or at any other term. The objection of these defendants to trial by jurors drawn from the jury box having been sustained, and they having been tried by a jury summoned and selected pursuant to the statute, and without discrimination on account of race or otherwise, the defendants may not attack the judgment entered against them because of a defect in the composition of the jury box from which the regular panel was drawn.

We have no information as to what action has or has not been taken with reference to the jury box since the trial of these cases, and that question is not now before us.

The special venire was not rendered invalid by reason of the fact that the sheriff who summoned it, pursuant to the orders of the court, was a witness for the State in these cases. *State v. Yoes*, 271 N.C. 616, 157 S.E. 2d 386; *Noonan v. State*, 117 Neb. 520, 221 N.W. 434, 60 A.L.R. 1118; 31 Am. Jur., Jury § 108; Anderson on Sheriffs, § 280.

We are, therefore, brought to the principal contention of the defendants, which, in effect, is that they had a lawful right wilfully to interrupt and disturb the operation of this public school for the reason that they were carrying signs bearing the above quoted words thereon, and the purpose of their marching was to convey to someone (obviously, students or teachers in the school) some idea. That is, the defendants assert that the Constitution of this State, Article 1, § 17, and the Fourteenth Amendment to the Constitution of the United States, permit them, with immunity from prosecution, to disrupt the operation of a public school so long as the means used by them for that purpose is marching back and forth in front of the school while carrying banners and placards on which words appear.

Freedom of speech and protest against the administration of public affairs, including public schools, is a fundamental right which has been cherished in this State since long before the adoption of the Fourteenth Amendment to the United States Constitution. It has, however, never been doubted that this is not an absolute freedom or

that the State, in the protection of the freedom of others and of its own paramount interests, such as its interest in the education of its children, may impose reasonable restraints of time and place upon the exercise of both speech and movement. Thus, in *State v. Ramsay, supra,* a former member of a religious congregation, who had been expelled therefrom for reasons or pursuant to a procedure which he deemed insufficient and unjust, was convicted and punished for disturbing public worship when he persisted in breaking into a worship service of the church and rearguing the supposed merits of his case. Neither the enactment of G.S. 14-273 nor its enforcement against these defendants in this case violated the Law of the Land Clause of Article I, § 17, of the Constitution of North Carolina.

The Fourteenth Amendment to the Constitution of the United States grants to the defendants no license wilfully to disturb the operation of a public or private school in this State.

G.S. 14-273 is not discriminatory upon its face. It is universal in its application. Anyone who does that which is prohibited by the statute is subject to its penalty. It does not confer upon an administrative official the authority to issue, in his discretion, permits to disturb public schools and, therefore, does not invite or permit that type of administrative discrimination against the disseminators of unpopular ideas which was condemned in *Saia v. New York,* 334 U.S. 558, 68 S. Ct. 1148, 92 L. Ed. 1574.

Neither the statute nor its application in this case has the slightest relation to State approval or disapproval of the ideas expressed on the signs carried by the defendants, or of the position taken by the defendants in their controversy, whatever it may have been, with the principal of the school. Like the ordinance involved in *Kovacs v. Cooper, supra,* this statute does not undertake censorship of speech or protest. As the Court said in the *Kovacs* case: "City streets are recognized as a normal place for the exchange of ideas by speech or paper. But this does not mean the freedom is beyond all control." Again in *Schneider v. State,* 308 U.S. 147, 60 S. Ct. 146, 84 L. Ed. 155, the Court, recognizing the authority of a municipality, as trustee for the public, to keep its streets open and available for the movement of people and property, said, by way of illustration, a person could not exercise his liberty of speech "by taking his stand in the middle of a crowded street, contrary to traffic regulations, and maintain his position to the stoppage of all traffic * * *" G.S. 14-273 does not have "the objectionable quality of vagueness and overbreadth" thought by the United States Supreme Court to render void the Virginia statue under examination in *NAACP v. Button,* 371 U.S. 415, 83 S. Ct. 328, 9 L. Ed. 2d 405. G.S. 14-273 is not "susceptible of sweeping and improper application" so·as to pre-

vent the advocacy of unpopular ideas and criticisms of public schools or public officials.

Unquestionably, "the hours and place of public discussion can be controlled" by the State in the protection of its legitimate and vital public interest in the efficient operation of schools, public or private. See *Saia v. New York, supra; Kovacs v. Cooper, supra.* The classic statement by Mr. Justice Holmes in *Schenck v. United States,* 249 U.S. 47, 39 S. Ct. 247, 63 L. Ed. 470, "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic," is still regarded by the Supreme Court of the United States as a correct interpretation of the First Amendment. The education of children in schools, public or private, is a matter of major importance to the State, at least as significant as the free flow of traffic upon a city street.

In *Cox v. Louisiana, supra,* the Court recognized that picketing and parading are subject to state regulation, even though intertwined with expression and association. There, the Court, quoting from *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 69 S. Ct. 684, 93 L. Ed. 834, said, "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed. Accordingly, the Court there held valid on its face a state statute prohibiting picketing and parading in or near a building housing a state court, with the intent of obstructing or impeding the administration of justice. The Court said, "Placards used as an essential and inseparable part of a grave offense against an important public law cannot immunize that unlawful conduct from State control." It deemed "irrelevant" the fact that "by their lights," the marchers in that case were seeking justice. Similarly, it is irrelevant here that the defendants may have been "by their lights" seeking the improvement of the educational processes at Southwestern High School. Whatever their motives, the result of their wilful activities was the disruption of those processes at that school. That is what the statute forbids and, in so doing, it does not violate limitations imposed upon the State by the First Amendment to the Constitution of the United States, now deemed by the Supreme Court of the United States to be made applicable to the states by the Fourteenth Amendment.

It is also irrelevant that the defendants marched silently, were not on the school grounds, and neither threatened nor provoked violence. Their actions can admit of no interpretation other than that they were planned and carried out for the sole purpose of attracting and holding the attention of students or teachers in the South-

western High School at a time when the program of the school required those students and teachers to be engaged in its instructional and training activities. There can also be no doubt that they succeeded in this purpose. The uncontradicted evidence as to the defendant Frinks is that, before the marching began, this statute was called to his attention and explained to him in substance, to which he replied, "I don't care anything about what is in the Statute Books." In the light of the uncontradicted evidence, the sentences imposed by the presiding judge were lenient.

As the Supreme Court of the United States said in *Cox v. Louisiana, supra,* "There is a proper time and place for even the most peaceful protest and a plain duty and responsibility on the part of all citizens to obey all valid laws and regulations." The defendants wilfully ignored this elementary principle of sound government under the Constitution of our country.

We have carefully examined each assignment of error and the authorities cited by the defendants in their brief. We find nothing in the statute, or in the proceedings in the court below, which entitles the defendants to a new trial or to the reversal or arrest of the judgments of the court below.

No error.