NO. COA13-1293

NORTH CAROLINA COURT OF APPEALS

Filed: 17 June 2014

In the matter of
    M.J.G.

Brunswick County
No. 13 JB 70

Appeal by juvenile from adjudication and disposition orders entered 10 July 2013 and 12 July 2013, respectively, by Judge Sherry D. Prince in Brunswick County District Court. Heard in the Court of Appeals 5 March 2014.

*Attorney General Roy Cooper, by Assistant Attorney General Susannah P. Holloway, for the State.*

*Mark Hayes for juvenile-appellant.*

McCULLOUGH, Judge.

The juvenile appeals from an adjudication order finding him delinquent of misdemeanor assault and disorderly conduct at school and from a level one disposition order. For the reasons stated herein, we affirm the orders of the trial court.

I.    Background

On 20 May 2013, two juvenile petitions were filed against M.J.G. ("the juvenile") in Brunswick County District Court alleging offenses of misdemeanor assault in violation of N.C.

Gen. Stat. § 14-33(a) and disorderly conduct in violation of N.C. Gen. State § 14-288.4(a)(6).

An adjudication hearing was held on 25 June 2013. Evidence presented at the adjudication hearing indicated that on 26 April 2013, a fundraiser volleyball game was being held in the gymnasium at Waccamaw Elementary School ("Waccamaw") in Brunswick County, North Carolina. Children from the fifth, sixth, seventh, and eighth grades were gathered in the gymnasium, watching the game. The juvenile was a sixth grade student at Waccamaw.

Emily Long, a teacher at Waccamaw, testified that she saw two boys in the bleachers "getting ready to fight" by having their "fists clenched." As Ms. Long was approaching the two boys, they were removed from the gymnasium by two other teachers, including Ms. Meagan Potts. Ms. Long testified that prior to the two boys being escorted out, she had seen the juvenile sitting next to the boys, waving at Ms. Potts and "telling her no, don't stop it, go away." Ms. Long told the juvenile she wanted to talk to him about "not waving off a fight," not "waving the teachers off[,]" and requested that he come off the bleachers to go outside with her. Ms. Long was on

the floor of the gymnasium and the juvenile was on the second or third bleacher. Ms. Long testified as follows:

> [a]t that point [the juvenile] got angry, did not want to come with me. I probably repeated four or five times for him to come on. He stormed off the bleachers and Ms. [Susan Wood] had come up behind me and he stormed right over her, ran right over her, pushed out the gym door. I walked behind him to go ahead and talk with him and kept asking him to stop and let me talk to him.

The juvenile walked down a hallway and the school resource office, Deputy Christopher Barbour, approached the juvenile and Ms. Long. The juvenile began shouting, "I'm tired of this f'ing school, these teachers lying on me, they're always lying on me." The juvenile put his finger less than an inch away from Long's face, "postured up chest to chest" and said "[e]specially you you mother-f***ing b****[.]" Thereafter, the juvenile backed Ms. Potts against a wall and "did the exact same thing to her."

Susan Wood, an emergency medical technician with Horry County Fire Rescue, testified that she was in the Waccamaw gymnasium on 26 April 2013. She was the parent of two children attending Waccamaw and decided to watch the game. After seeing a commotion, Wood walked over to Ms. Long's location to see if there was a medical issue that needed assistance. Wood testified to the following:

When I got to [Ms. Long], she was asking [the juvenile] to come out of the stands.  Once I realized that it wasn't a medical issue, he was doing this at her – shut up, shut your mouth, go away, we don't need you, go away, shut up, go away.  And I – I was shocked. . . .  I decided to stand and observe.

[The juvenile] finally stood up after, you know, doing this motion at her, chopping at her face, and telling her to go away, get out of here, we don't need you.  Stood up -- there was plenty of room between Ms. Long and myself on either side and he was two or three bleachers up and came down the bleachers and body checked me.  And the look on his face was very defiant, almost ha, ha.

. . . .

I ended up taking three or four steps back to keep from falling.

Deputy Christopher Barbour, the Waccamaw school resource officer, testified that he was standing in a hallway adjacent to the gymnasium when he spoke with Ms. Long.  As Ms. Long was attempting to explain the situation to Deputy Barber, the juvenile "turned around and [the juvenile] started walking back towards us and he was, you know, flaring his arms no, stop, don't, quit lying, you know, things of that nature."  Deputy Barbour told the juvenile to leave the building but the juvenile "jumped up, stomped his feet, and then he started cussing."  Deputy Barbour further testified to the following:

> I originally thought he was going to go around me to go out the door because that was the direction in which he was headed. But he just moseyed on right around me and that's when he got into Ms. Long's face, began cursing her, cursing Ms. Potts and [another teacher.]

Deputy Barbour "had to physically put [his] hands on [the juvenile] to remove him from the hallway[.]" Once the juvenile was outside of the building, he continued to "curse and holler and scream." The juvenile was escorted to the main office of the school.

On 10 July 2013, the trial court entered a "Juvenile Adjudication Order" finding the juvenile delinquent of both offenses. Following a disposition hearing held on 10 July 2013, the juvenile received a Level I disposition. The juvenile was ordered to be placed on probation for 12 months.

The juvenile appeals.

## II. Discussion

On appeal, the juvenile argues that the trial court erred by (A) failing to find that he was delinquent of the offense of misdemeanor assault beyond a reasonable doubt; (B) allowing Ms. Wood to characterize his expression as "defiant" and alternatively, to deny his motion to dismiss the petition for misdemeanor assault; (C) denying his motion to dismiss the

petition for disorderly conduct; and (D) holding a sham disposition hearing and violating the statutory mandate to allow the juvenile's parents to present evidence.

A. Standard of Proof

First, the juvenile argues that the trial court erred by failing to find in its adjudication order, that he was delinquent of the offense of misdemeanor assault beyond a reasonable doubt. We disagree.

It is well established that

> [t]he allegations of a petition alleging the juvenile is delinquent shall be proved beyond a reasonable doubt. Further, [i]f the court finds that the allegations in the petition have been proved . . ., the court *shall* so state. . . . [I]t is reversible error for a trial court to fail to state affirmatively that an adjudication of delinquency is based upon proof beyond a reasonable doubt.

*In re D.K.*, 200 N.C. App. 785, 788, 684 S.E.2d 522, 525 (2009) (citations and quotation marks omitted).

Specifically, the juvenile argues that the adjudication order does not include the conclusion of law that he committed assault beyond a reasonable doubt and that the adjudication order does not include findings of fact inferring such a conclusion. The juvenile relies on *In re J.V.J.,* 209 N.C. App. 737, 707 S.E.2d 636 (2011), for his contentions. In *J.V.J.*, the

juvenile argued that the trial court failed to make sufficient findings of fact to support the conclusion that the juvenile had committed the offense of assault on a government officer, and our Court agreed. *Id.* at 739, 707 S.E.2d at 637. Our Court noted that with respect to an adjudication order in the juvenile delinquency context, N.C. Gen. Stat. § 7B-2411 provided that

> [i]f the court finds that the allegations in the petition have been proved [beyond a reasonable doubt], the court shall so state in a written order of adjudication, *which shall include, but not be limited to*, the date of the offense, the misdemeanor or felony classification of the offense, and the date of adjudication.

*Id.* at 739-40, 707 S.E.2d at 637 (emphasis in original). In *J.V.J.*, the trial court failed to address any of the allegations set out in the juvenile petition. It even failed to "summarily aver that 'the allegations in the petition have been proved[.]'". *Id.* at 740, 707 S.E.2d at 638. Accordingly, our Court remanded the case to the trial court to make the statutorily mandated findings of fact as set out in N.C. Gen. Stat. § 7B-2411 (2009). *Id.* at 741, 707 S.E.2d at 638.

In the case *sub judice*, however, the facts are readily distinguishable. Our review indicates that the 10 July 2013 "Juvenile Adjudication Order" entered by the trial court states that the "petition(s) before the court" included "misdemeanor

assault." It also contains a blank space where the trial court is to state findings of fact which "have been proven beyond a reasonable doubt." In this blank space, the trial court indicated "please see attached 'Adjudication Findings of Fact.'"

The attached "Adjudication Findings of Fact" included the following findings of fact:

> That on or about April 26, 2013, the Juvenile was a spectator of a fundraiser volleyball game inside the gymnasium of Waccamaw School in Ash, North Carolina. Waccamaw School is a public educational institution in Brunswick County. That during the volleyball game, which took place at the end of a half-day of school, a disturbance between two other juveniles began. After the disturbance, Ms. Emily Long, a teacher at Waccamaw School, asked the Juvenile to come down from the bleachers and leave the gymnasium as it appeared to her that he was instigating the potential fight between the other juveniles. The Juvenile at first resisted, but then came off the bleachers. While he was coming off the bleachers, he came into contact with Ms. Susan Wood, an EMT and parent of another student that was watching the volleyball game, by hitting Ms. Wood in her shoulder and chest area with his shoulder as he walked by her, causing Ms. Wood to move backwards.

> That after the Juvenile left the gymnasium he went to an adjacent hallway to wait for Ms. Long. Classes were not in session in this hallway. The Juvenile, Ms. Long, Ms. Wood, two other teachers, one of the students involved in the original disturbance, two [vendors], and possibly

other students were present in the hallway at this time. Deputy Chris Barbour, the School Resource Officer, was present shortly after the Juvenile entered the hallway. A confrontation occurred whereby the Juvenile became angry, erratic, and unresponsive to the requests of Dept. Barbour. The Juvenile began yelling at and directing profanity at several teachers, refused to leave the area when instructed to by Dept. Barbour, and only left the hallway after being [forced] to by Dept. Barbour. The students in the gymnasium could not hear this altercation in the hallway, but this conduct did disturb the peace, order, or discipline at Waccamaw School.

The "Juvenile Adjudication Order" also states that, "[t]he Court concludes as a matter of law, that in regard to the allegations in the petition(s) before the Court" the juvenile is delinquent. Here, the petition for misdemeanor assault alleged that juvenile committed simple assault by "forcefully hitting the victim in her shoulder, breast, and chest area with his shoulder, causing the victim to move back a few steps."

Based on the foregoing, we reject the juvenile's arguments that the trial court failed to find that he had committed misdemeanor assault beyond a reasonable doubt and affirm the adjudication order of the trial court.

B.  <u>Ms. Wood's Testimony and the Juvenile's Motion to Dismiss</u>

In his second argument, the juvenile asserts that the trial court erroneously allowed Ms. Wood to testify that his

expression was "defiant." Alternatively, the juvenile argues that the trial court erred by denying his motion to dismiss the petition for assault based on insufficiency of the evidence.

At the juvenile's adjudication hearing, Ms. Wood testified to the following:

> [The juvenile] finally stood up after, you know, doing this motion at [Ms. Long], chopping at her face, and telling her to go away, get out of here, we don't need you. Stood up -- there was plenty of room between Ms. Long and myself on either side and he was two or three bleachers up and came down the bleachers and body checked me. And the look on his face was very defiant, almost ha, ha.

The juvenile objected to this testimony and the trial court overruled his objection.

The juvenile, relying on *State v. Sanders*, 295 N.C. 361, 245 S.E.2d 674 (1978) (citation omitted), argues that ordinarily, "a witness's opinion of another person's intention on a particular occasion is generally held to be inadmissible." *Id.* at 369-70, 245 S.E.2d at 681 (citation omitted). Here, however, we believe that Ms. Wood's testimony is more appropriately characterized as describing the juvenile's demeanor on 26 April 2013.

Our Court addressed this issue in *State v. Stager*, 329 N.C. 278, 406 S.E.2d 876 (1991), by providing the following:

Opinion evidence as to the demeanor of a criminal defendant is admissible into evidence. *See State v. Moore*, 276 N.C. 142, 171 S.E.2d 453 (1970). The rule has been stated as follows:

> The instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time, are, legally speaking, matters of fact, and are admissible in evidence.

> A witness may say that a man appeared intoxicated or angry or pleased. In one sense the statement is a conclusion or opinion of the witness, but in a legal sense, and within the meaning of the phrase, 'matter of fact,' as used in the law of evidence, it is not opinion, but is one of the class of things above mentioned, which are better regarded as matters of fact. The appearance of a man, his actions, his expression, his conversation – a series of things – go to make up the mental picture in the mind of the witness which leads to a knowledge which is as certain, and as much a matter of fact, as if he testified, from evidence presented to his eyes, to the color of a person's hair, or any other physical fact of like nature.

*Id.* at 321, 406 S.E.2d at 900-901 (citations and quotation marks omitted).

Ms. Wood's testimony that juvenile's "look on his face" was "very defiant" related to her perception of the juvenile shortly after the alleged incident. Because this testimony stemmed from Ms. Wood's personal experience combined with Ms. Wood's observation of juvenile, it was admissible to shed light upon the circumstances surrounding the alleged incident, and thus, was relevant and admissible. *See* N.C. Gen. Stat. § 8C-1, Rule 401 and 402 (2013) (Rule 401 states that "relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 states that "[a]ll relevant evidence is admissible" except as otherwise provided by the United States and North Carolina Constitutions, as well as an Act of Congress or the General Assembly, or by these rules). Therefore, we reject the juvenile's argument that the trial court erred by admitting this challenged testimony.

In the alternative, juvenile argues that the trial court should have granted his motion to dismiss because there was no other evidence to indicate that his act was intentional. We find the juvenile's arguments unpersuasive.

> Where the juvenile moves to dismiss, the trial court must determine 'whether

> there is substantial evidence (1) of each
> essential element of the offense charged, .
> . . and (2) of [juvenile's] being the
> perpetrator of such offense. In reviewing a
> motion to dismiss a juvenile petition, the
> evidence must be considered in the light
> most favorable to the State, which is
> entitled to every reasonable inference that
> may be drawn from the evidence.

*In re S.M.*, 190 N.C. App. 579, 581, 660 S.E.2d 653, 654-55 (2008) (citations omitted). An assault is "an overt act or attempt, with force or violence, to do some immediate physical injury to the person of another, which is sufficient to put a person of reasonable firmness in fear of immediate physical injury." *State v. Porter*, 340 N.C. 320, 331, 457 S.E.2d 716, 721 (1995) (citation omitted).

A thorough review of the record demonstrates that Ms. Wood's testimony that the juvenile was "very defiant" is not the only evidence to establish that the juvenile acted with intent. Ms. Wood testified that the juvenile stood up after arguing with Ms. Long, and "there was plenty of room between Ms. Long and myself on either side and he was two or three bleachers up and came down the bleachers and body checked me." Ms. Wood also testified that she "ended up taking three or four steps back to keep from falling." Furthermore, Ms. Long testified that juvenile "stormed off the bleachers and Ms. Woods [sic] had come

up behind me and he stormed right over her, ran right over her, pushed out the gym door."

In a juvenile adjudication hearing, "the court is empowered to assign weight to the evidence presented at the trial as it deems appropriate. . . . [T]he trial judge acts as both judge and jury, thus resolving any conflicts in the evidence." *In re Oghenekevebe*, 123 N.C. App. 434, 439, 473 S.E.2d 393, 397 (1996) (citations omitted). Reviewing the foregoing evidence in the light most favorable to the State, we hold that there was sufficient evidence for the trial court to determine that the juvenile's actions were intentional. Accordingly, we hold that the trial court did not err by denying the juvenile's motion to dismiss the petition for misdemeanor assault.

C.    Motion to Dismiss Petition for Disorderly Conduct

The juvenile argues that his actions did not amount to disorderly conduct because there was insufficient evidence that juvenile's actions amounted to a disturbance of the peace, order, or discipline at his school when no students, classes, or programs were in any way affected and his actions minimally affected the staff's activities. Accordingly, he argues that the trial court erred by denying his motion to dismiss the petition for disorderly conduct. We disagree.

Section 14-288.4(a)(6) of the North Carolina General Statutes provides that:

> (a) Disorderly conduct is a public disturbance intentionally caused by any person who does any of the following:
>
> . . . .
>
> (6) Disrupts, disturbs or interferes with the teaching of students at any public or private educational institution or engages in conduct which disturbs the peace, order or discipline at any public or private educational institution or on the grounds adjacent thereto.

N.C. Gen. Stat. § 14-288.4(a)(6) (2013). "Our Supreme Court has held that the conduct must cause a 'substantial interference with, disruption of and confusion of the operation of the school in its program of instruction and training of students there enrolled.'" *In re M.G.*, 156 N.C. App. 414, 416, 576 S.E.2d 398, 400 (2003) (citation omitted).

The juvenile cites to *In re Eller*, 331 N.C. 714, 417 S.E.2d 479 (1992) as providing guidance for identifying behavior which constitutes a violation of N.C. Gen. Stat. § 14-288.4(a)(6). In *Eller*, the trial court adjudicated two students as delinquent of disorderly conduct. The respondent Greer, then a fourteen-year-old student at Beaver Creek High School, made a move toward another student with a carpenter's nail in her hand during a

basic special education reading class. *Id.* at 715, 417 S.E.2d at 480. The other student dodged respondent Greer's move. This move was made while the teacher was giving a reading assignment at the chalkboard. *Id.* The teacher in the class approached respondent Greer after relating the assignment and asked her what was in respondent Greer's hand. Respondent Greer willingly gave the teacher the carpenter's nail. The other students in the class "observed the discussion and resumed their work when so requested by [the teacher]." *Id.* At a later date, respondent Greer and another fifteen-year-old student named Eller, were in a mathematics class. The respondents Greer and Eller were seated at the rear of the classroom with their peers when they at least once each, struck the metal shroud of a radiator "more than two or three times." *Id.* at 716, 417 S.E.2d at 480. Each strike produced a "rattling, metallic noise" which caused their fellow peers to look "toward where the sound was coming from" and caused the teacher to interrupt her lecture for fifteen to twenty seconds each time. *Id.* at 716, 417 S.E.2d at 481. Our Supreme Court held that the State had not produced substantial evidence that the respondents' behavior constituted a "substantial interference" because, *inter alia*, "the radiator incident merited no intervention by the instructor other than

glares of disapproval for a total of at most sixty seconds during the entire class period" and "other students were only modestly interrupted from their work and returned to their lesson upon being instructed to do so by their teacher" after "the nail incident." *Id.* at 718, 417 S.E.2d at 482.

The *Eller* court cited to two cases to support its conclusion – *State v. Wiggins*, 272 N.C. 147, 158 S.E.2d 37 (1967) and *State v. Midgett*, 8 N.C. App. 230, 174 S.E.2d 124 (1970). These two cases illustrate the level of interference necessary to sustain a conviction of disorderly conduct. The *Wiggins* court held that a motion for nonsuit was properly overruled by the trial court where student-defendants picketed on school grounds in front of a school building. *Wiggins*, 272 N.C. at 155, 158 S.E.2d at 43. The *Wiggins* court stated that "[a]s a direct result of the [student-defendants'] activities, the work of the class in bricklaying was terminated because the teacher could not retain the attention of his students, and disorder was created in the classrooms and hallways of the school building itself." *Id.* In *Midgett*, our Court affirmed the denial of a motion for nonsuit when twelve student-defendants entered the office of the secretary to the principal of a public school. *Midgett*, 8 N.C. App. at 233, 174 S.E.2d at

127. The student-defendants told the secretary that "they were going to interrupt us that day" and "locked the secretary out of her office, moved furniture about, scattered papers and dumped some books on the floor." *Id.* Because of the student-defendants' actions, the secretary, the principal, and another teacher "were drawn or kept away from their jobs or classes" and school was dismissed early. *Id.* As such, our Court held that there was ample evidence to support all of the elements of disorderly conduct. *Id.* at 233, 174 S.E.2d at 128.

The juvenile argues that the circumstances of the present case are more similar to those found in *Eller* and distinguishable from the facts found in *Wiggins* and *Midgett*. After thoroughly reviewing the record, we disagree.

Ms. Long testified that there were 200 to 300 children in the gymnasium. Ms. Wood testified that "[e]verybody was watching what was happening between the teacher[, Ms. Long,] and the [juvenile]." Two students testified that while they were in the school's gymnasium, they witnessed the disturbance. Ms. Long was not able to supervise students or fulfill her duties in the gymnasium because she had to assist in escorting the juvenile out of the gymnasium. When the juvenile was in the hallway, shouting at Ms. Long and Ms. Potts, at least four other

students were in the hallway. In addition, Ms. Wood testified that during the incident, "there was a lot of disjointed information going on" as students "were being shoved on . . . busses." Significantly, "a group of special needs students came into the office and because of everything that had just happened they had missed their bus."

The facts of the case *sub judice*, viewed in the light most favorable to the State, demonstrate that the juvenile's conduct caused a substantial interference with, disruption of, and confusion of the operation of the school. Unlike the circumstances found in *Eller* and comparable to the facts found in *Midgett*, the juvenile's conduct merited intervention by several teachers, the assistant principal, as well as the school resource officer. In addition, the juvenile's actions caused such disruption and disorder, similar to those found in *Midgett and Wiggins*, that a group of special needs students missed their buses. Therefore, we hold that the trial court did not err by denying the juvenile's motion to dismiss the charge of disorderly conduct.

## D.   Disposition Hearing

In his final argument, the juvenile argues that several errors occurred at his disposition hearing.

First, the juvenile argues that the fact that his dispositional hearing on 10 July 2013 commenced at 9:47 a.m. and concluded twelve minutes later, necessarily leads to the conclusion that the conditions of juvenile's probation was signed by the trial court judge prior to the hearing, thus resulting in a "sham" hearing. We note that the juvenile cites to no authority to support his assumption. Furthermore, the juvenile's assertion is unpersuasive as the trial court judge did not sign the disposition order until 12 July 2013, two days following the day of the hearing.

In his second argument, the juvenile contends that the trial court erred by allowing his mother to be heard only subsequent to the trial court entering his disposition. After careful review, we disagree.

Section 7B-2501 of the North Carolina General Statutes provides that "(b) The juvenile and the juvenile's parent, guardian, or custodian shall have an opportunity to present evidence, and they may advise the court concerning the disposition they believe to be in the best interests of the juvenile." N.C. Gen. Stat. § 7B-2501 (2013).

At the disposition hearing, the trial court ordered, as a condition of the juvenile's disposition, that the juvenile's

parents attend "Strengthening Families" parenting classes. Thereafter, the juvenile's counsel stated that the juvenile's mother "did want to say a few words." The trial court judge gave an opportunity to the juvenile's mother to speak. The following exchange took place:

> THE COURT: . . . I think you'll be a very beneficial member of the Strengthening Families team. I have found at that program it's very helpful to share experiences.
>
> And because you have that belief, I think you'll be a good leader possibly in that group and a good resource person and will be very beneficial not only for you but for others to see what it means to be supportive of your children and that sort of thing. And that's why I'm asking that you not as -- certainly not as punishment for you but I think it would be -- that group is a very beneficial group overall. And --
>
> [The juvenile's mother:] Maybe I can be a positive influence on somebody else.

Assuming *arguendo* that the juvenile is correct in his contention that the trial court decided the terms of his disposition prior to allowing the juvenile's mother to be heard, we find this error to be harmless based on the fact that the juvenile's mother did not object to the condition of attending the "Strengthening Families" classes but effectively agreed with the trial court.

## III. Conclusion

Where we find the juvenile's challenges to the adjudication and disposition orders unpersuasive, we affirm the orders of the trial court.

Affirmed.

Judges HUNTER, Robert C., and GEER concur.