STROUD, Judge, concurring.
*449 I concur in the result reached by the majority, since I tend to agree that the juvenile court counselor's signature on the petition may be necessary to invoke jurisdiction, although I also note that the juvenile court counselor was present and participating in the hearing. I write separately to concur because I believe that even if the court had jurisdiction, the adjudication and disposition orders would have to be reversed. It is unusual for a concurring opinion to address an issue which perhaps need not be addressed since the adjudication is being vacated. Yet I also recognize the possibility of further appellate review and feel compelled to note *468 other errors in this adjudication and disposition.
Mr. Tamoris Wooten, a behavioral specialist at Goldsboro High School testified that Thomas told him he had prior juvenile court involvement, but on the day of this incident, was almost done with his probation. No doubt Thomas had been encouraged during his involvement with juvenile court not to engage with other students who may cause a "ruckus" and instead to seek assistance from school personnel if problems occurred. Indeed, when a "ruckus" did occur, Thomas did exactly "the right thing"-as the lower court even noted-by going directly to Mr. Wooten to try to protect himself and avoid getting into trouble. But then, right in front of Mr. Wooten, another student punched Thomas in the face and attempted to continue punching him as he was on the ground.
After another staff member arrived and the boys were separated, Mr. Wooten began walking with Thomas to the office and "was talking to him to try to find out what was going on." Thomas said something Mr. Wooten described as profanity. Mr. Wooten could not remember any particular words or phrases Thomas used. Mr. Wooten told Thomas to stop cursing and he did. There is no evidence that anyone other than Mr. Wooten even heard Thomas, though the hallway they were walking down did have many other students in it.
Perhaps another student, instead of cursing, would have instead cried; both are noises which may attract the attention of other students or school personnel. Since we don't know what the words were, really, all we know is that he made a noise. But there is no doubt Thomas's exclamation-whatever he said-was a response to an attack by another student; it was not something initiated by Thomas with the intent to "[d]isrupt[ ], disturb[ ] or interfere[ ] with the teaching of students ... or disturb[ ] the peace, order or discipline" of the school, which is a *450 necessary element of the offense for which he was adjudicated as delinquent. N.C. Gen. Stat. § 14-288.4(a)(6) (2015).
Once Thomas had calmed down, he told Mr. Wooten that he and the other student were "in the neighborhood" and had some sort of disagreement a week or so earlier. On the morning of the incident, the issue "just started to boil back up and they were having words with each other" in the cafeteria. Thomas then sought out Mr. Wooten to avoid any trouble, and later in the office, told Mr. Wooten "he didn't want to get in trouble because he was just coming off from being in trouble with probation and stuff." Mr. Wooten explained what he was thinking when he was talking to Thomas, "So I'm saying, okay, here's a kid that's maybe trying to make the right decision. So then at that point, then I left it alone and I stepped out of the room where he was and left him."
Though Mr. Wooten had no prior dealings with Thomas and had only been at this particular school for two days, he also testified about his role as a behavioral specialist and noted that he tries to teach students to turn to him for help:
I say, you know, 'Walk away and let an administrator or let me know, and let us deal with those type of things instead of you guys trying to fight your battles. That's why I'm here, and that's why the administration is here. But you guys have got to understand'-I say, 'Stop trying to gain hallway cred, which means you're trying to establish credibility with your friends in the hallway. It's okay to walk away. That doesn't make you a coward. That doesn't make you, as they say, a punk. That doesn't make you soft. It makes you smart. And if you do it this way, then the outcome could be different for you when we start to do the investigation on what discipline needs to be given out.'
Thomas did exactly that-he walked away from the issue in the cafeteria and went to Mr. Wooten for help.
As noted by the majority, the simple affray petition was dismissed, leaving the disorderly conduct at school ("disorderly conduct") petition which was unsigned by the court counselor. The disorderly conduct petition alleged that Thomas had violated North Carolina General Statute § 14-288.4(a)(6) by "arguing loudly in a Goldsboro High School hallway with another student, [Brad], which ultimately *469 led to a physical altercation in the Goldsboro High School hallway[.]" We do not know from the adjudication order exactly what conduct the lower court based the adjudication upon, because the section of the form which is *451 to include findings of fact for those facts "proven beyond a reasonable doubt" is entirely blank.
But upon adjudicating Thomas as delinquent, the trial court stated the reasons for adjudication, and it was based solely upon Thomas's use of profanity:
You did everything right except one thing, close your mouth. You walked away. That's the right thing to do. You went and found the gentleman. That was absolutely the right thing to do. This kid that came up and blindsided you and punched you, that was wrong. Putting up your arm while you were on the floor, that's self-defense. It depends on how many punches you threw back before you crossed the line of engaging in the fight rather than self-defense, but that issue is not before me.
The main reason I adjudicated you is because you were engaging in the verbal aspect coming down the hall, and then after you were punched with the profanity. You've just got to be a bigger man. I know. I understand anger. I understand you might want to let it rip with profanity. You don't want anybody talking junk to you. The gentleman said a little pride might have been involved. You did everything right except refrain from talking, the running of the mouth and then the cussing.
Ultimately Thomas was adjudicated under North Carolina General Statute § 14-288.4(a)(6) which provides:
(a) Disorderly conduct is a public disturbance intentionally caused by any person who ...
....
(6) [d]isrupts, disturbs or interferes with the teaching of students at any public or private educational institution or engages in conduct which disturbs the peace, order or discipline at any public or private educational institution or on the grounds adjacent thereto.
N.C. Gen. Stat. § 14-288.4(a)(6).
Although the petition cites only conduct prior to the "physical altercation"-"arguing loudly in a ... hallway"-the lower court seemingly *452 adjudicated Thomas based only on conduct which occurred after the altercation, his "cussing," because there was no evidence Thomas used "profanity" or engaged in "cussing" before the physical altercation as the petition alleged. Thus, even assuming that after the altercation Thomas "cussed" loudly where many students could hear, there was also simply no evidence that by his cursing he intentionally sought to "disrupt[ ], disturb[ ], or interfere[ ] with the teaching of students" or that he intentionally "disturb[ed] the peace, order or discipline" of the school. Mr. Wooten was the only witness for the State and nothing in his testimony indicates Thomas used profanity or cursed for any reason other than the fact that he had just been punched in the face. Indeed, Mr. Wooten testified that Thomas was likely "cursing and making noise" due in part to adrenaline-an adrenaline rush most people would likely experience if suddenly punched in the face.
Several cases which have addressed disorderly conduct in a school demonstrate the necessity of the evidence of intentional disruption of the educational process in the school. See generally State v. Wiggins , 272 N.C. 147, 158 S.E.2d 37 (1967) ; State v. Midgett , 8 N.C.App. 230, 174 S.E.2d 124 (1970) ; In re M.J.G. , 234 N.C.App. 350, 759 S.E.2d 361 (2014). In State v. Wiggins , our Supreme Court considered convictions arising from a group picketing and marching in front of a school during the school day when classes were in progress. 272 N.C. 147, 155, 158 S.E.2d 37, 43 (1967). The evidence showed that the picketing substantially interrupted the school's operations:
The marchers carried placards or signs. These signs were utterly meaningless except on the assumption that they related to some controversy between the defendants and the administration of the school, specifically Principal Singleton. Presumably, they were deemed by the defendants sufficient *470 to convey some idea to students or teachers in the school. The site was the edge of a rural road running in front of the school grounds, with only two residences in the vicinity. There is nothing to indicate that the marchers intended or desired to communicate any idea whatsoever to travelers along the highway, or to any person other than students and teachers in the Southwestern High School. As a direct result of their activities, the work of the class in bricklaying was terminated because the teacher could not retain the attention of his students, and *453 disorder was created in the classrooms and hallways of the school building itself.
Id.
The defendants in Wiggins argued that the statute under which they were convicted was too vague and indefinite to be enforced. See id. at 153, 158 S.E.2d at 42. The Court rejected this argument and noted that the statute was clear:
When the words 'interrupt' and 'disturb' are used in conjunction with the word 'school,' they mean to a person of ordinary intelligence a substantial interference with, disruption of and confusion of the operation of the school in its program of instruction and training of students there enrolled. We found no difficulty in applying this statute, in accordance with this construction, to the activities of a group of white defendants in State v. Guthrie , 265 N.C. 659, 144 S.E.2d 891. Obviously, the statute applies in the same manner regardless of the race of the defendant. In State v. Ramsay , 78 N.C. 448 [ (1878) ], in affirming a conviction for the similar offense of disturbing public worship, this Court, speaking through Smith, C.J., said:
'It is not open to dispute whether the acts of the defendant were a disturbance in the sense that subjects him to a criminal prosecution, and that the jury was warranted in so finding, when they had the admitted effect of breaking up the congregation and frustrating altogether the purposes for which it had convened.'
Giving the words of G.S. 14-273 their plain and ordinary meaning, it is apparent that the elements of the offense punishable under this statute are: (1) Some act or course of conduct by the defendant, within or without the school; (2) an actual, material interference with, frustration of or confusion in, part or all of the program of a public or private school for the instruction or training of students enrolled therein and in attendance thereon, resulting from such act or conduct; and (3) the purpose or intent on the part of the defendant that his act or conduct have that effect.
Id. at 154, 158 S.E.2d at 42-43.
*454 Another case that illustrates an intentional interruption of a school is State v. Midgett , wherein the defendants
entered the office of the secretary while the principal, Mr. Simmons, was away from the school; the secretary knew or recognized most of the boys who were there; they informed her that 'they were going to interrupt us that day' and she could either leave or stay in the room, but that she could not pass in and out as she normally did; and that if she stayed she could make such telephone calls as she wished. The secretary telephoned Mr. Simmons and then went to get Mr. Hunter, who normally was in charge in Mr. Simmons' absence. While she was gone, her room was locked, and she was not permitted to return to her office. According to the testimony, filing cabinets and tables were moved against the doors and interior windows to further bar entry.
Daniel Williams testified that he was teaching a class across the hall from the office at the time of the incident He stated that he left that class to investigate the incident at the office and did not resume teaching that day.
Principal Simmons testified that when he returned to the school a little before 12 noon, he found that the office doors were locked and the bell system was being actuated manually from within the office. He determined that the 'presence of persons who were not enrolled' and 'commotion' necessitated the dismissal of school, and therefore he ordered the children walked to the buses and sent them home a little after noon and prior to the usual closing.
*471 8 N.C.App. at 231, 174 S.E.2d at 126. This Court determined that this evidence showed a substantial interference with the school. Id. at 233-34, 174 S.E.2d at 127-28.
Here, the State has two deficiencies in its evidence: both the intention to disturb and an actual disturbance. See N.C. Gen. Stat. § 14-288.4(a)(6). First, there is no evidence that Thomas's behavior-"cussing"-was intended to disturb school as his brief "cussing" was a response to being attacked. See id. Thomas stopped "cussing" when Mr. Wooten told him to; if his intent was to disrupt the school he likely would have gone on "cussing." Thomas was the victim here, and thus this case stands in stark contrast to In re M.J.G. , where a student cursed at teachers and the disposition against him was affirmed. Contrast *455 In re M.J.G. , 234 N.C.App. at 351-52, 759 S.E.2d at 362-63 ("The juvenile began shouting, 'I'm tired of this f'ing school, these teachers lying on me, they're always lying on me.' The juvenile put his finger less than an inch away from Long's face, 'postured up chest to chest' and said '[e]specially you you mother-f***ing b****[.]' Thereafter, the juvenile backed Ms. Potts against a wall and 'did the exact same thing to her.' ").
Second, there was no evidence of disruption or interruption of the school by Thomas's cursing. Thomas was accompanied by Mr. Wooten, the behavioral specialist, to the office. Thomas did not take Mr. Wooten away from his work duties; helping Thomas was Mr. Wooten's work duty. There was no evidence of involvement by any teachers, other than the one who helped to pull Thomas's attacker off of him and the principal who dispersed students who wanted to see the "fight" Brad started when he attacked Thomas. Mr. Wooten testified that the incident occurred "as the bell rung for them to begin to go to first period" so it appears that classes had not even begun yet which is why so many students were still in the hallway. Thus, at best for the State, some students or others in the school may have heard Thomas cursing in the hall, but there is no evidence of interruption of any class or school activity. In this regard, this case is similar to In re Eller , in which our Supreme Court determined there was no evidence of disorderly conduct at school when the juvenile made an aggressive move toward another student and later banged on a radiator in the classroom:
Greer ma[d]e a move toward another student, who was separated by an aisle, causing the other student to dodge Greer's move. Ms. Weant finished relating the assignment, then approached Greer and asked Greer to show her what was in Greer's hand. Greer thereupon "willingly" and without delay gave Ms. Weant a carpenter's nail. The other students observed the discussion and resumed their work when so requested by Ms. Weant[, and on a later date,]
... Greer and Eller were seated at the rear of the classroom with their peers in a single, horizontal row parallel to the rear wall situated near a radiator located on the wall. During the course of their instruction time, Greer and Eller "more than two or three times" struck the metal shroud of the radiator. Ms. Weant testified that she saw each child strike the radiator at least once. Each time contact was made, a rattling, metallic noise was produced that caused the other students to look "toward where the sound was coming from" and caused Ms. Weant *456 to interrupt her lecture for fifteen to twenty seconds each time the noise was made. Ms. Weant did not intervene other than to silently stare at Greer and Eller for fifteen to twenty seconds and then resume her teaching. She did, however, report the incident to the school principal that afternoon or the following day.
331 N.C. 714, 715-16, 417 S.E.2d 479, 480-81 (1992).
The Supreme Court determined that this evidence did not support a finding of disruption of the school:
Respondents' behavior in the instant case pales in comparison to that encountered in Wiggins and Midgett , and those cases are readily distinguishable on their facts. Here, even the small classes in which respondents perpetrated their disruptive behavior were not interrupted for any appreciable length of time or in any significant way, and the students' actions merited only relatively mild intervention by their teacher. We agree with respondents that *472 while egregious behavior such as that condemned in Wiggins and Midgett is not required to violate N.C.G.S. § 14-288.4(a)(6), more than that present in the case at bar is necessary.
Id. at 719, 417 S.E.2d at 482-83.
Thomas's behavior here "pales in comparison to that encountered in Wiggins and Midgett " and even Eller . Id. at 719, 417 S.E.2d at 482. There is no evidence that Thomas's cursing in the hall caused any disruption. Thus, even assuming the petition had been signed invoking jurisdiction, the adjudication and disposition orders would necessarily need to be reversed. Furthermore, as to the disposition order specifically, even the State concedes that the disposition order is in error since it has no findings whatsoever to support the disposition.
For the reasons noted above, I concur with the majority opinion vacating the adjudication and disposition orders for lack of subject matter jurisdiction, but even assuming the lower court had jurisdiction to hear this case, I would reverse since there was no evidence Thomas violated North Carolina General Statute § 14-288.4(a)(6).