IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA16-1047

 Filed: 16 May 2017

Wayne County, No. 13 JB 96

In the Matter of T.K.

 Appeal by Juvenile-Appellant from orders entered 26 May 2016 by Judge Les

Turner in Wayne County District Court. Heard in the Court of Appeals 7 March

2017.

 Attorney General Joshua H. Stein, by Special Deputy Attorney General Gerald
 K. Robbins, for the State.

 Appellate Defendant Glenn Gerding, by Assistant Appellate Defender Aaron
 Thomas Johnson, for Juvenile-Appellant.

 INMAN, Judge.

 The omissions of a signature by a juvenile court counselor, or other appropriate

representative of the State, and the words “Approved for Filing” in a petition in a

juvenile delinquency case amount to a jurisdictional error that precludes the district

court’s authority to consider the matter contained within the petition.

 T.K. (Thomas),1 Juvenile-Appellant, appeals from orders adjudicating him

delinquent and imposing a level 2 disposition placing him on twelve months of

probation and requiring him to perform 30 hours of community service. Thomas

 1 A pseudonym is used to protect the identity of the juvenile.
 IN RE T.K.

 Opinion of the Court

argues that because the petition lacked the requisite signature and “Approved for

Filing” language from the juvenile court counselor, the district court lacked

jurisdiction to hear the matter. After careful consideration, we agree and vacate the

trial court’s orders and dismiss the petition.

 Facts and Procedural Background

 At the beginning of the school day on Saint Patrick’s Day 2016, before the start

of first period, a behavioral specialist at Goldsboro High School, Tamoris Wooten,

stood watch in the hallway as the students headed to class. Thomas, walking away

from a “ruckus” down the hall, approached Wooten, told him, “I’m going to stand right

here,” and stated “Sir, I’m not trying to get in trouble this morning.” Before Wooten

could ask Thomas any questions about what he meant, a second student, Brad,2

walked up to Thomas, said a few words, and punched Thomas in the face. Thomas

dropped to the floor.

 Thomas tried unsuccessfully to climb to his feet while Brad continued

punching him. A crowd of around 25 to 30 students gathered around them. Wooten

called for staff assistance. Thomas “put his arm up to get [Brad] off of him,” and

threw one or two punches. Another male staff member helped Wooten separate the

boys and Wooten walked with Thomas away from the fight.

 2 A pseudonym is used to protect the identity of the juvenile.

 -2-
 IN RE T.K.

 Opinion of the Court

 As Wooten led Thomas away down the hall to his office, Thomas uttered what

was later described as “profanity.” Wooten instructed Thomas to stop cursing and to

calm down. Thomas stopped cursing by the time they reached Wooten’s office and

Wooten left him in his office to calm down.

 On 26 April 2016, Officer Nicki Artis of the Goldsboro Police Department

submitted a complaint with the Clerk of Wayne County Superior Court alleging that

Thomas was delinquent because he committed a simply affray, a Class 2

misdemeanor, in violation of N.C. Gen. Stat. § 14-33(a) at his school on 17 March

2016. On 5 May 2016, a juvenile court counselor signed the complaint and marked it

“Approved for Filing” as a petition. The petition was then filed with the Wayne

County District Court and the matter was scheduled for hearing on 26 May 2016.

 On the day of the hearing, Officer Artis signed a second petition related to the

same incident, alleging that Thomas was delinquent because he committed disorderly

conduct at school. This second petition alleged that Thomas had disturbed the

discipline at Goldsboro High School by “arguing loudly in a Goldsboro High School

hallway with another student, [Brad], which ultimately led to a physical altercation

. . . .” This second petition was not signed by a court counselor, nor was it marked as

“Approved for Filing,” but it was nevertheless filed with the district court.

 During the hearing, the State dismissed the simply affray charge and

proceeded only on the disorderly conduct petition. The trial court adjudicated

 -3-
 IN RE T.K.

 Opinion of the Court

Thomas delinquent for disorderly conduct, imposed a Level 2 disposition, ordered

Thomas to be placed on a 12 month probation, and ordered him to perform 30 hours

of community service.

 Thomas timely appealed.

 Analysis

 Before a court can address any matter on the merits, it must have jurisdiction.

Thomas asserts that the trial court lacked subject matter jurisdiction to consider the

second petition filed against him because the juvenile court counselor failed to sign

the petition and mark whether the petition was “Approved for Filing” as required by

N.C. Gen. Stat. § 7B-1703. We agree.

 “A universal principle as old as the law is that the proceedings of a court

without jurisdiction of the subject matter are a nullity.” Burgess v. Gibbs, 262 N.C.

462, 465, 137 S.E.2d 806, 808 (1964) (citation omitted). “Subject matter jurisdiction

is the indispensable foundation upon which valid judicial decisions rest, and in its

absence a court has no power to act[.]” In re T.R.P., 360 N.C. 588, 590, 636 S.E.2d

787, 790 (2006) (citations omitted).

 “Our General Assembly ‘within constitutional limitations, can fix and

circumscribe the jurisdiction of the courts of this State.’ ” Id. (quoting Bullington v.

Angel, 220 N.C. 18, 20, 16 S.E.2d 411, 412 (1941)). “Where jurisdiction is statutory

and the Legislature requires the Court to exercise its jurisdiction in a certain manner,

 -4-
 IN RE T.K.

 Opinion of the Court

to follow a certain procedure, or otherwise subjects the Court to certain limitations,

an act of the Court beyond these limits is in excess of its jurisdiction.” Eudy v. Eudy,

288 N.C. 71, 75, 215 S.E.2d 782, 785 (1975), overruled on other grounds by Quick v.

Quick, 305 N.C. 446, 290 S.E.2d 653 (1982). “[W]here it is required by statute that

[a] petition be signed and verified, these essential requisites must be complied with

before the petition can be used for legal purposes.” In re Green, 67 N.C. App. 501,

503, 313 S.E.2d 193, 194-95 (1984) (citation omitted).

 The General Assembly, by enacting the Juvenile Code, imposed specific

requirements that must be satisfied before a district court obtains jurisdiction in

juvenile cases. For a petition alleging a juvenile delinquent, the Juvenile Code states

that

 [e]xcept as provided in [N.C. Gen. Stat. §] 7B-1706, if the
 juvenile court counselor determines that a complaint
 should be filed as a petition, the counselor shall file the
 petition as soon as practicable, but in any event within 15
 days after the complaint is received, with an extension for
 a maximum of 15 additional days at the discretion of the
 chief court counselor. The juvenile court counselor shall
 assist the complainant when necessary with the
 preparation and filing of the petition, shall include on it the
 date and the words “Approved for Filing”, shall sign it, and
 shall transmit it to the clerk of superior court.

N.C. Gen. Stat. § 7B-1703 (2015) (emphasis added). This Court has stated that “[w]e

cannot overemphasize the importance of the intake counselor’s evaluation in cases

involving juveniles alleged to be delinquent or undisciplined.” In re Register, 84 N.C.

 -5-
 IN RE T.K.

 Opinion of the Court

App. 336, 346, 352 S.E.2d 889, 894-95 (1987). The role of the counselor is “to ensure

that the needs and limitations of the juveniles and the concern for the protection of

public safety have been objectively balanced before a juvenile petition is filed

initiating court action.” Id. at 346, 352 S.E.2d at 895. Our courts have not previously

addressed whether the signature and the “Approved for Filing” designation on a

juvenile petition are prerequisites to the district court’s jurisdiction.

 In In re D.S., 364 N.C. 184, 194, 694 S.E.2d 758, 764 (2010), the North Carolina

Supreme Court held that the Legislature did not intend the time deadlines imposed

by N.C. Gen. Stat. § 7B-1703 to “function as [a] prerequisite[] for district court

jurisdiction over allegedly delinquent juveniles.” The Court looked to the

Legislature’s intent in imposing the deadline at issue in that case. Id. at 192, 694

S.E.2d at 763. The Court further noted that its decision was “consistent with the

conclusions reached in prior North Carolina appellate decisions that have addressed

Chapter 7B timeline requirements and jurisdiction, particularly in the context of

abuse, neglect, and dependency and termination of parental rights.” Id. at 194, 694

S.E.2d at 764 (citations omitted). In re D.S. does not address whether the statute’s

requirements for signature and approval for filing by a juvenile court counselor or

other appropriate representative of the State are prerequisites to district court

jurisdiction.

 -6-
 IN RE T.K.

 Opinion of the Court

 In the absence of precedent on the precise issue before us, we turn to analogous

case authority for guidance. In a case involving a petition to adjudicate a juvenile as

abused or neglected, this Court held that “the failure of the petitioner to sign and

verify the petition before an official authorized to administer oaths rendered the

petition fatally deficient and inoperative to invoke the jurisdiction of the court over

the subject matter.” In re Green, 67 N.C. App. 504, 313 S.E.2d at 195 (vacating the

trial court’s denial of a motion to dismiss because “the trial court lacked jurisdiction

over the subject matter”). In In re Green, the Juvenile Code required the petition

alleging abuse and neglect to be signed and verified pursuant to N.C. Gen. Stat. § 7A-

544 and N.C. Gen. Stat. § 7A-561(b).3 Id. Because the petition lacked the necessary

signatures and verification, our Court concluded that the trial court necessarily

lacked jurisdiction over the matter. Id.

 The State urges us to extend the holding in In re D.S. to recognize failures to

comply with the signature and “Approved for Filing” requirements for a petition

alleging delinquency as non-jurisdictional errors. Such an extension would conflict

with the purpose of the Juvenile Code. Section 7B-1500 articulates the following

purposes and policies underlying the statutes related to delinquent juveniles:

 (1) To protect the public from acts of delinquency.

 (2) To deter delinquency and crime, including patterns of
 repeat offending:

 3 The relevant sections of N.C. Gen. Stat. § 7A have been re-codified under N.C. Gen. Stat. §
7B and are sufficiently similar for our purposes.

 -7-
 IN RE T.K.

 Opinion of the Court

 a. By providing swift, effective dispositions that
 emphasize the juvenile offender’s accountability for
 the juvenile’s actions; and

 b. By providing appropriate rehabilitative services
 to juveniles and their families.

 (3) To provide an effective system of intake services for the
 screening and evaluation of complaints and, in appropriate
 cases, where court intervention is not necessary to ensure
 public safety, to refer juveniles to community-based
 resources.

 (4) To provide uniform procedures that assure fairness and
 equity; that protect the constitutional rights of juveniles,
 parents, and victims; and that encourage the court and
 others involved with juvenile offenders to proceed with all
 possible speed in making and implementing
 determinations required by this Subchapter.

N.C. Gen. Stat. § 7B-1500 (2015) (emphasis added). The juvenile court counselor’s

role in signing and approving a petition for delinquency is the only indication on the

face of a petition that a complaint against a juvenile has been screened and evaluated

by an appropriate authority. Not unlike the signature of a Grand Jury foreperson

with the indication “true bill” on an indictment sought by a prosecutor, the juvenile

court counselor’s signature and approval for filing on a petition reflects that the

complaint has not simply been asserted, but that it has satisfied the first test of

validity in the court system.

 Consistent with our precedent in In re Green, the Supreme Court’s precedent

in In re D.S., and the Legislature’s intent in drafting the Juvenile Code, we conclude

 -8-
 IN RE T.K.

 Opinion of the Court

that a petition alleging delinquency that does not include the signature of a juvenile

court counselor, or other appropriate representative of the State,4 and the language

“Approved for Filing,” the petition fails to invoke the trial court’s jurisdiction in the

subject matter.

 Here, the petition alleging Thomas delinquent for disorderly conduct at school

failed to include a signature from the juvenile court counselor and does not indicate

whether or not it was “Approved for Filing.” The trial court therefore was without

jurisdiction to proceed on the merits of this petition. Because we conclude that the

trial court lacked subject matter jurisdiction, we deem it unnecessary to discuss

Thomas’s other assignments of error.

 VACATED AND DISMISSED.

 Judge BRYANT concurs.

 Judge STROUD concurs by separate opinion.

 4 N.C. Gen. Stat. § 7B-1704 (2015) provides an alternate route for the district court’s
jurisdiction when a juvenile counselor denies approval of filing a petition. In such instances, the
district attorney may approve the filing if the record affirmatively discloses that the juvenile counselor
denied the approval. See In re Register, 84 N.C. App. at 343-44, 352 S.E.2d at 893. Our ruling today
does not address and should not interfere with the appeal process delineated in N.C. Gen. Stat. §§ 7B-
1704 or 7B-1705.

 -9-
No. COA16-1047 – In re T.K.

STROUD, Judge, concurring.

 I concur in the result reached by the majority, since I tend to agree that the

juvenile court counselor’s signature on the petition may be necessary to invoke

jurisdiction, although I also note that the juvenile court counselor was present and

participating in the hearing. I write separately to concur because I believe that even

if the court had jurisdiction, the adjudication and disposition orders would have to be

reversed. It is unusual for a concurring opinion to address an issue which perhaps

need not be addressed since the adjudication is being vacated. Yet I also recognize

the possibility of further appellate review and feel compelled to note other errors in

this adjudication and disposition.

 Mr. Tamoris Wooten, a behavioral specialist at Goldsboro High School testified

that Thomas told him he had prior juvenile court involvement, but on the day of this

incident, was almost done with his probation. No doubt Thomas had been encouraged

during his involvement with juvenile court not to engage with other students who

may cause a “ruckus” and instead to seek assistance from school personnel if

problems occurred. Indeed, when a “ruckus” did occur, Thomas did exactly “the right

thing” -- as the lower court even noted -- by going directly to Mr. Wooten to try to

protect himself and avoid getting into trouble. But then, right in front of Mr. Wooten,

another student punched Thomas in the face and attempted to continue punching

him as he was on the ground.
 IN RE T.K.

 STROUD, J., concurrence

 After another staff member arrived and the boys were separated, Mr. Wooten

began walking with Thomas to the office and “was talking to him to try to find out

what was going on.” Thomas said something Mr. Wooten described as profanity. Mr.

Wooten could not remember any particular words or phrases Thomas used. Mr.

Wooten told Thomas to stop cursing and he did. There is no evidence that anyone

other than Mr. Wooten even heard Thomas, though the hallway they were walking

down did have many other students in it.

 Perhaps another student, instead of cursing, would have instead cried; both

are noises which may attract the attention of other students or school personnel.

Since we don’t know what the words were, really, all we know is that he made a noise.

But there is no doubt Thomas’s exclamation -- whatever he said -- was a response to

an attack by another student; it was not something initiated by Thomas with the

intent to “[d]isrupt[], disturb[] or interfere[] with the teaching of students . . . or

disturb[] the peace, order or discipline” of the school, which is a necessary element of

the offense for which he was adjudicated as delinquent. N.C. Gen. Stat. § 14-

288.4(a)(6) (2015).

 Once Thomas had calmed down, he told Mr. Wooten that he and the other

student were “in the neighborhood” and had some sort of disagreement a week or so

earlier. On the morning of the incident, the issue “just started to boil back up and

they were having words with each other” in the cafeteria. Thomas then sought out

 2
 IN RE T.K.

 STROUD, J., concurrence

Mr. Wooten to avoid any trouble, and later in the office, told Mr. Wooten “he didn’t

want to get in trouble because he was just coming off from being in trouble with

probation and stuff.” Mr. Wooten explained what he was thinking when he was

talking to Thomas, “So I'm saying, okay, here’s a kid that’s maybe trying to make the

right decision. So then at that point, then I left it alone and I stepped out of the room

where he was and left him.”

 Though Mr. Wooten had no prior dealings with Thomas and had only been at

this particular school for two days, he also testified about his role as a behavioral

specialist and noted that he tries to teach students to turn to him for help:

 I say, you know, ‘Walk away and let an administrator or let
 me know, and let us deal with those type of things instead
 of you guys trying to fight your battles. That’s why I’m
 here, and that’s why the administration is here. But you
 guys have got to understand’ -- I say, ‘Stop trying to gain
 hallway cred, which means you're trying to establish
 credibility with your friends in the hallway. It’s okay to
 walk away. That doesn’t make you a coward. That doesn’t
 make you, as they say, a punk. That doesn’t make you soft.
 It makes you smart. And if you do it this way, then the
 outcome could be different for you when we start to do the
 investigation on what discipline needs to be given out.’

Thomas did exactly that -- he walked away from the issue in the cafeteria and went

to Mr. Wooten for help.

 As noted by the majority, the simple affray petition was dismissed, leaving the

disorderly conduct at school (“disorderly conduct”) petition which was unsigned by

the court counselor. The disorderly conduct petition alleged that Thomas had

 3
 IN RE T.K.

 STROUD, J., concurrence

violated North Carolina General Statute § 14-288.4(a)(6) by “arguing loudly in a

Goldsboro High School hallway with another student, [Brad], which ultimately led to

a physical altercation in the Goldsboro High School hallway[.]” We do not know from

the adjudication order exactly what conduct the lower court based the adjudication

upon, because the section of the form which is to include findings of fact for those

facts “proven beyond a reasonable doubt” is entirely blank.

 But upon adjudicating Thomas as delinquent, the trial court stated the reasons

for adjudication, and it was based solely upon Thomas’s use of profanity:

 You did everything right except one thing, close your
 mouth. You walked away. That’s the right thing to do.
 You went and found the gentleman. That was absolutely
 the right thing to do. This kid that came up and blindsided
 you and punched you, that was wrong. Putting up your
 arm while you were on the floor, that’s self-defense. It
 depends on how many punches you threw back before you
 crossed the line of engaging in the fight rather than self-
 defense, but that issue is not before me.
 The main reason I adjudicated you is because you
 were engaging in the verbal aspect coming down the hall,
 and then after you were punched with the profanity.
 You’ve just got to be a bigger man. I know. I understand
 anger. I understand you might want to let it rip with
 profanity. You don’t want anybody talking junk to you.
 The gentleman said a little pride might have been involved.
 You did everything right except refrain from talking, the
 running of the mouth and then the cussing.

Ultimately Thomas was adjudicated under North Carolina General Statute § 14-

288.4(a)(6) which provides:

 (a) Disorderly conduct is a public disturbance

 4
 IN RE T.K.

 STROUD, J., concurrence

 intentionally caused by any person who . . .
 ....
 (6) [d]isrupts, disturbs or interferes with
 the teaching of students at any public
 or private educational institution or
 engages in conduct which disturbs
 the peace, order or discipline at any
 public or private educational
 institution or on the grounds adjacent
 thereto.

N.C. Gen. Stat. § 14-288.4(a)(6).

 Although the petition cites only conduct prior to the “physical altercation” --

“arguing loudly in a . . . hallway” -- the lower court seemingly adjudicated Thomas

based only on conduct which occurred after the altercation, his “cussing,” because

there was no evidence Thomas used “profanity” or engaged in “cussing” before the

physical altercation as the petition alleged. Thus, even assuming that after the

altercation Thomas “cussed” loudly where many students could hear, there was also

simply no evidence that by his cursing he intentionally sought to “disrupt[], disturb[],

or interfere[] with the teaching of students” or that he intentionally “disturb[ed] the

peace, order or discipline” of the school. Mr. Wooten was the only witness for the

State and nothing in his testimony indicates Thomas used profanity or cursed for any

reason other than the fact that he had just been punched in the face. Indeed, Mr.

Wooten testified that Thomas was likely “cursing and making noise” due in part to

adrenaline -- an adrenaline rush most people would likely experience if suddenly

punched in the face.

 5
 IN RE T.K.

 STROUD, J., concurrence

 Several cases which have addressed disorderly conduct in a school demonstrate

the necessity of the evidence of intentional disruption of the educational process in

the school. See generally State v. Wiggins, 272 N.C. 147, 158 S.E.2d 37 (1967); State

v. Midgett, 8 N.C. App. 230, 174 S.E.2d 124 (1970); In re M.J.G., 234 N.C. App. 350,

759 S.E.2d 361 (2014). In State v. Wiggins, our Supreme Court considered convictions

arising from a group picketing and marching in front of a school during the school

day when classes were in progress. 272 N.C. 147, 155, 158 S.E.2d 37, 43 (1967). The

evidence showed that the picketing substantially interrupted the school’s operations:

 The marchers carried placards or signs. These signs were
 utterly meaningless except on the assumption that they
 related to some controversy between the defendants and
 the administration of the school, specifically Principal
 Singleton. Presumably, they were deemed by the
 defendants sufficient to convey some idea to students or
 teachers in the school. The site was the edge of a rural road
 running in front of the school grounds, with only two
 residences in the vicinity. There is nothing to indicate that
 the marchers intended or desired to communicate any idea
 whatsoever to travelers along the highway, or to any
 person other than students and teachers in the
 Southwestern High School. As a direct result of their
 activities, the work of the class in bricklaying was
 terminated because the teacher could not retain the
 attention of his students, and disorder was created in the
 classrooms and hallways of the school building itself.

Id.

 6
 IN RE T.K.

 STROUD, J., concurrence

 The defendants in Wiggins argued that the statute under which they were

convicted was too vague and indefinite to be enforced. See id. at 153, 158 S.E.2d at

42. The Court rejected this argument and noted that the statute was clear:

 When the words ‘interrupt’ and ‘disturb’ are used in
 conjunction with the word ‘school,’ they mean to a person
 of ordinary intelligence a substantial interference with,
 disruption of and confusion of the operation of the school in
 its program of instruction and training of students there
 enrolled. We found no difficulty in applying this statute, in
 accordance with this construction, to the activities of a
 group of white defendants in State v. Guthrie, 265 N.C. 659,
 144 S.E.2d 891. Obviously, the statute applies in the same
 manner regardless of the race of the defendant. In State v.
 Ramsay, 78 N.C. 448, in affirming a conviction for the
 similar offense of disturbing public worship, this Court,
 speaking through Smith, C.J., said:
 ‘It is not open to dispute whether the
 acts of the defendant were a disturbance in
 the sense that subjects him to a criminal
 prosecution, and that the jury was warranted
 in so finding, when they had the admitted
 effect of breaking up the congregation and
 frustrating altogether the purposes for which
 it had convened.’
 Giving the words of G.S. 14—273 their plain and
 ordinary meaning, it is apparent that the elements of the
 offense punishable under this statute are: (1) Some act or
 course of conduct by the defendant, within or without the
 school; (2) an actual, material interference with,
 frustration of or confusion in, part or all of the program of
 a public or private school for the instruction or training of
 students enrolled therein and in attendance thereon,
 resulting from such act or conduct; and (3) the purpose or
 intent on the part of the defendant that his act or conduct
 have that effect.

Id. at 154, 158 S.E.2d at 42-43.

 7
 IN RE T.K.

 STROUD, J., concurrence

 Another case that illustrates an intentional interruption of a school is State v.

Midgett, wherein the defendants

 entered the office of the secretary while the principal, Mr.
 Simmons, was away from the school; the secretary knew or
 recognized most of the boys who were there; they informed
 her that ‘they were going to interrupt us that day’ and she
 could either leave or stay in the room, but that she could
 not pass in and out as she normally did; and that if she
 stayed she could make such telephone calls as she wished.
 The secretary telephoned Mr. Simmons and then went to
 get Mr. Hunter, who normally was in charge in Mr.
 Simmons’ absence. While she was gone, her room was
 locked, and she was not permitted to return to her office.
 According to the testimony, filing cabinets and tables were
 moved against the doors and interior windows to further
 bar entry.
 Daniel Williams testified that he was teaching a
 class across the hall from the office at the time of the
 incident He stated that he left that class to investigate the
 incident at the office and did not resume teaching that day.
 Principal Simmons testified that when he returned
 to the school a little before 12 noon, he found that the office
 doors were locked and the bell system was being actuated
 manually from within the office. He determined that the
 ‘presence of persons who were not enrolled’ and
 ‘commotion’ necessitated the dismissal of school, and
 therefore he ordered the children walked to the buses and
 sent them home a little after noon and prior to the usual
 closing.

8 N.C. App. at 231, 174 S.E.2d at 126. This Court determined that this evidence

showed a substantial interference with the school. Id. at 233-34, 174 S.E.2d at 127-

28.

 8
 IN RE T.K.

 STROUD, J., concurrence

 Here, the State has two deficiencies in its evidence: both the intention to

disturb and an actual disturbance. See N.C. Gen. Stat. § 14-288.4(a)(6). First, there

is no evidence that Thomas’s behavior – “cussing” – was intended to disturb school as

his brief “cussing” was a response to being attacked. See id. Thomas stopped

“cussing” when Mr. Wooten told him to; if his intent was to disrupt the school he

likely would have gone on “cussing.” Thomas was the victim here, and thus this case

stands in stark contrast to In re M.J.G., where a student cursed at teachers and the

disposition against him was affirmed. Contrast In re M.J.G., 234 N.C. App. at 351-

52, 759 S.E.2d at 362-63 (“The juvenile began shouting, ‘I’m tired of this f’ing school,

these teachers lying on me, they’re always lying on me.’ The juvenile put his finger

less than an inch away from Long’s face, ‘postured up chest to chest’ and said

‘[e]specially you you mother-f***ing b****[.]’ Thereafter, the juvenile backed Ms.

Potts against a wall and ‘did the exact same thing to her.’”).

 Second, there was no evidence of disruption or interruption of the school by

Thomas’s cursing. Thomas was accompanied by Mr. Wooten, the behavioral

specialist, to the office. Thomas did not take Mr. Wooten away from his work duties;

helping Thomas was Mr. Wooten’s work duty. There was no evidence of involvement

by any teachers, other than the one who helped to pull Thomas’s attacker off of him

and the principal who dispersed students who wanted to see the “fight” Brad started

when he attacked Thomas. Mr. Wooten testified that the incident occurred “as the

 9
 IN RE T.K.

 STROUD, J., concurrence

bell rung for them to begin to go to first period” so it appears that classes had not

even begun yet which is why so many students were still in the hallway. Thus, at

best for the State, some students or others in the school may have heard Thomas

cursing in the hall, but there is no evidence of interruption of any class or school

activity. In this regard, this case is similar to In re Eller, in which our Supreme Court

determined there was no evidence of disorderly conduct at school when the juvenile

made an aggressive move toward another student and later banged on a radiator in

the classroom:

 Greer ma[d]e a move toward another student, who was
 separated by an aisle, causing the other student to dodge
 Greer’s move. Ms. Weant finished relating the assignment,
 then approached Greer and asked Greer to show her what
 was in Greer’s hand. Greer thereupon “willingly” and
 without delay gave Ms. Weant a carpenter’s nail. The other
 students observed the discussion and resumed their work
 when so requested by Ms. Weant[, and on a later date,]
 . . . Greer and Eller were seated at the rear of the
 classroom with their peers in a single, horizontal row
 parallel to the rear wall situated near a radiator located on
 the wall. During the course of their instruction time, Greer
 and Eller “more than two or three times” struck the metal
 shroud of the radiator. Ms. Weant testified that she saw
 each child strike the radiator at least once. Each time
 contact was made, a rattling, metallic noise was produced
 that caused the other students to look “toward where the
 sound was coming from” and caused Ms. Weant to
 interrupt her lecture for fifteen to twenty seconds each
 time the noise was made. Ms. Weant did not intervene
 other than to silently stare at Greer and Eller for fifteen to
 twenty seconds and then resume her teaching. She did,
 however, report the incident to the school principal that
 afternoon or the following day.

 10
 IN RE T.K.

 STROUD, J., concurrence

331 N.C. 714, 715-16, 417 S.E.2d 479, 480–81 (1992).

 The Supreme Court determined that this evidence did not support a finding of

disruption of the school:

 Respondents’ behavior in the instant case pales in
 comparison to that encountered in Wiggins and Midgett,
 and those cases are readily distinguishable on their facts.
 Here, even the small classes in which respondents
 perpetrated their disruptive behavior were not interrupted
 for any appreciable length of time or in any significant way,
 and the students’ actions merited only relatively mild
 intervention by their teacher. We agree with respondents
 that while egregious behavior such as that condemned in
 Wiggins and Midgett is not required to violate N.C.G.S. §
 14–288.4(a)(6), more than that present in the case at bar is
 necessary.

Id. at 719, 417 S.E.2d at 482–83.

 Thomas’s behavior here “pales in comparison to that encountered in Wiggins

and Midgett” and even Eller. Id. at 715-16, 417 S.E.2d at 480-81. There is no evidence

that Thomas’s cursing in the hall caused any disruption. Thus, even assuming the

petition had been signed invoking jurisdiction, the adjudication and disposition

orders would necessarily need to be reversed. Furthermore, as to the disposition

order specifically, even the State concedes that the disposition order is in error since

it has no findings whatsoever to support the disposition.

 For the reasons noted above, I concur with the majority opinion vacating the

adjudication and disposition orders for lack of subject matter jurisdiction, but even

 11
 IN RE T.K.

 STROUD, J., concurrence

assuming the lower court had jurisdiction to hear this case, I would reverse since

there was no evidence Thomas violated North Carolina General Statute § 14-

288.4(a)(6).

 12